**BEFORE THE JUDICIAL PANEL ON MULTI DISTRICT LITIGATION**

_____  :

**In re SERESTO  FLEA & TICK
COLLAR  LITIGATION**

MDL Docket No.

_____  :

**BRIEF IN SUPPORT OF PLAINTIFF'S MOTION FOR TRANSFER OF ACTIONS TO
THE DISTRICT OF NEW JERSEY PURSUANT TO 28 U.S.C. § 1407**

Pursuant to 28 USC § 1407 and Rule 7.2(a) of the Rules of Procedure of the Judicial Panel on Multidistrict Litigation, Laura Revolinsky, plaintiff in the putative class action *Revolinsky. v. Elanco Animal Health Incorporated and Bayer Healthcare LLC* No. 3:21-cv-0003, (D.N.J.)(Wigenton) ("Plaintiff"); respectfully submits this brief in support of her motion requesting that all currently-filed cases identified in the Schedule of Actions ("Actions"), as well as any cases subsequently filed involving similar facts or claims ("tag along cases")(collectively, "Related Actions"), be transferred to the United States District Court for the District of New Jersey for centralized and coordinated pretrial proceedings.

Presently, there are twelve actions pending in a number of judicial districts in the United States alleging similar wrongful conduct on the part Elanco Animal Health Incorporation and Bayer Healthcare LLC, herein Defendants.  As discussed below, these actions all involve Flea and Tick Collars manufactured by Defendants and sold throughout the United States. It is likely that additional similar actions will be filed in additional jurisdictions across the country.  Transfer for consolidation and coordination is proper because each of the Actions and tag along cases arise out of the same or similar nucleus of operative facts, arise out of the same or similar alleged wrongful conduct, will involve the resolution of the same or similar questions of fact and law, and discovery will be substantially similar and will involve the same documents and witnesses.

1

All of these actions are in their infancy and none of the actions have commenced discovery.

## I.    BACKGROUND

Defendant Bayer Healthcare LLC ("Bayer") is a Delaware corporation with its principal place of business in Whippany, New Jersey.  Defendant Elanco Animal Health Incorporated ("Elanco")  is an Indiana corporation, with its principal place of business in Greenfield, Indiana. Bayer sold its Animal and Health Division to Elanco in 2020.

Seresto Collars were developed by Bayer and are now sold by Elanco, which is the leading seller of pet collars, generating over $300 million in revenue in 2019. Seresto collars work by releasing small amounts of pesticide onto the animal for months at a time. The pesticide is supposed to kill fleas, ticks and other pests but be safe for cats and dogs.  However, since Seresto flea and tick collars were introduced in 2012, the EPA has received incident reports of at least 1,698 related pet deaths. Overall, through June 2020, the agency has received more than 75,000 incident reports related to the collars, including nearly 1,000 involving human harm.

Recently, there have been articles in the press about the significant number of adverse events associated with the Seresto collars, and the failure of the EPA to inform the public about the associated risks. In March 2021 the Midwest Center for Investigative Reporting, released a report after conducting an extensive investigation involving the two pesticides contained in Seresto Collars, which are imidacloprid and flumethrin.  According to the report, "Imidacloprid belongs to the neonicotinoid class of insecticides, which are the most commonly used insecticides on crops in the U.S. Despite neonicotinoids being connected to massive die-offs of non-target insects such as bees and butterflies, the EPA proposed re-approving imidacloprid and other class members last year. The pesticide is banned in the European Union for outdoor use but allowed in pet collars. There is also growing evidence that mammals can be harmed by these pesticides as well."

2

"Flumethrin, EPA documents show, is only an active ingredient in one product: Seresto."  Id.
Experts have opined that the combination of Imidacloprid and Flumethrin is what is causing the
harm to the pets. Reported symptoms include, but are not limited to seizures, vomiting, heart
arrhythmia, fatigue and even death.  Nathan Donley, a senior scientist at the Center for Biological
Diversity and an expert on U.S. pesticide regulation said he is not "sure what makes the two
pesticides so likely to cause harm, but it is clear something is wrong with the product… You don't
even see these kinds of numbers with many agricultural chemicals… For whatever reason, this
combination is just really nasty."  Id.

Defendants were aware of the problems with the Seresto Collars as early as 2013.  From
2013 through 2019, almost 1,000 human incidents of rash, redness of skin, skin lesions, hives,
headaches, numbness, tingling and seizures related to the use of the Seresto Collars on pets were
reported to the EPA.  Ninety-two of the events occurred in 2013.

In October 2016, the EPA responded to concerns about adverse effects of the collars.  The
EPA issued a public response bulletin indicating that "since the initial registration [of Seresto in
March 2012] EPA has received reports of undesirable effects to domestic animals using Seresto
collars.  EPA is evaluating those reports as part of the current registration review of flumethrin."
Despite Defendants' knowledge of the defective collars causing injuries and death to dogs and cats
using the collars, the packaging for Seresto collars contains no disclaimer warning that the risks
of toxicity may be so great that they could possibly be responsible for thousands of pet deaths.

In March 2021,  the Subcommittee on Economic and Consumer Policy of the United States
House of Representatives requested that Elanco "immediately institute a temporary recall of all
Seresto flea and tick collars, following reports that the collars may have killed thousands of pets
and may have caused injuries to many more pets as well as humans."  To date, no recall has been

3

instituted.

Plaintiff alleges that the Defendants knew, or were reckless in not knowing, as early as 2013, that the Seresto Collars contained a defect that could cause severe injury or death to pets. Defendants had sole and exclusive possession of this knowledge. Notwithstanding this knowledge, Defendants uniformly concealed this material information in its marketing, advertising, and sale of the Seresto Collars, which Defendants knew to be defective, both at the time of sale and on an ongoing basis and failed to take remedial action. Despite Defendant's knowledge of the Defect, they have promoted, and Elanco continues to promote, the safety and efficacy of Seresto collars. Indeed, on its website the only warning disclosed is that "occasionally, scratching may be observed in dogs who are not used to wearing collars during the first few days after fitting.  Clients should ensure the collar is not fitted too tightly.  Slight hair loss and mild skin reactions due to the mechanical irritation of the collar may occur at the application site; this usually clears within one or two weeks without the need for collar removal."   See https://www.elancodvm.com/our-products/seresto/seresto-dogs.  The website provides the same warning for the Seresto for Cats Collar.  See https://www.elancodvm.com/our-products/seresto/seresto-cats

In fact, the labels for all versions of the product (Cats, Small Dogs, and Large Dogs) do not warn of any serious injuries or death.  Similar to the website warnings, the extent of the warnings on the product labels relate to possible skin irritations and slight hair loss at the application site, which "usually recover in 1or 2 weeks."

As a consequence of Defendants' false and misleading statements and active and ongoing concealment of the Defect, Plaintiffs and the Class Members purchased Seresto Collars and have incurred damages. In addition to affirmatively misleading the Class Members, Defendants routinely declined to provide Class Members refunds for the amount they paid to purchase the

Seresto Collar and for any out of pocket damages related to treating their pets for injuries caused by the Seresto Collar.

### PLAINTIFFS' EXPERIENCE WITH SERESTO COLLARS

Laura Revolinsky is a citizen of the State of New Jersey who owned two King Charles Cavalier Spaniels. For the past four years she purchased Seresto Collars at a cost of approximately $60 each to help prevent the dogs from being infested and or harmed by fleas and ticks. At the time of purchase, Ms. Revolinskly reviewed the packaging and description of the Seresto Collar which stated that the Seresto Collar was a safe and effective way of preventing fleas and ticks for her dogs.

Ms. Revolinsky placed the Seresto Collars on both dogs every year for 8 months per year during the Spring, Summer and Fall months.   In April 2020, shortly after placing the Seresto Collar on her dog Bentley, Bentley developed a cough.  She took Bentley to the veterinarian as a result.  After an examination, the veterinarian determined that Bentley had a heart murmur and an enlarged heart.  The veterinarian prescribed medication for Bentley's heart condition. On July 12, 2020, Ms. Revolinsky found Bentley unresponsive.  He was wearing the Seresto Collar.  Bentley had passed away. Ms. Revolinsky never made the connection between the death of her dog and the Seresto Collar until seeing the article published in USA Today on March 2, 2021.  She immediately stopped using the Seresto Collar on Alfred.

The Product harmed Ms. Revolinsky's dog Bentley to the point that it caused Bentley to pass away from heart disease.  Indeed, many users of the Seresto Collar have reported incidents of their dogs or cats suffering heart arrythmia. Had Defendants disclosed the existence of the serious safety risks associated with Seresto Collars, Plaintiff would have never purchased the Seresto Collars.  Plaintiff did not receive the benefit of her bargain.  Plaintiff has spent over $500 on

Seresto Collars for her dogs.  Ms. Revolinsky filed this action on April 22, 2021.

Because Seresto is sold throughout the United States, there will likely be many more claims filed throughout the various United States district courts.

## ARGUMENT

### I.   THE PANEL SHOULD TRANSFER THE SERESTO FLEA AND TICK COLLAR CASES FOR CONSOLIDATED PROCEEDINGS.

Consolidation of all Actions is appropriate here. Transfer for coordinated or consolidated pretrial proceedings is appropriate where: (1) the actions involve "one or more common questions of fact" and law; and (2) consolidation will be for the "convenience of parties and witnesses and will promote the just and efficient conduct of such actions." *See* 28 U.S.C. § 1407(a). Here, all of the cases involve common questions of fact relating to the Defendant's manufacture and sale of Seresto Flea and Tick Collars which cause injury to the Pets wearing them and deprive Plaintiffs of the benefit of their bargain. Additionally, transferring these Actions for consolidated pretrial proceedings will significantly reduce the burden on the federal courts, the parties, and the witnesses involved. Manuel for Complex Litigation (Fourth) §20.131 (2004); see also In re General Motors Corp. Piston Slap Prods. Liab. Litig., 314 F. Supp. 2d 1386, 1388 (J.P/M.L. 2004)(transferring actions and stating that "[c]entralization under Section 1407 is necessary in order to eliminate duplicative discovery, prevent inconsistent pretrial rulings (especially with respect to class certification matters), and conserve the resources of the parties, their counsel and the judiciary"); In re Amazon.com, Inc., MDL No. 2527, 2014 WL 1364747, at *1 (J.P.M.L. April 8, 2014)(same).

Without transfer, the federal court system will be forced to administer – and the parties will be forced to litigate – many similar actions on different pretrial schedules. The Actions allege

6

similar legal claims and necessarily require overlapping factual inquiries. Discovery in each will require much of the same information from Bayer and Elanco. Transferring the Actions to a single judge will preserve judicial resources by avoiding the need for federal judges in multiple districts, to address identical legal issues and similar factual patterns.

In addition, centralization of class actions are proper even if only a few cases are filed in different districts. See, e.g., In re Charlotte Russe, Inc., Fair & Accurate Credit Transactions Act (FACTA) Litig., 505 F. Supp. 2d 1377, 1378 (J.P.M.L. 2007) (holding that centralization of two cases was appropriate). Here, a dozen cases have already been filed seven different Districts.

## II.    THE DISTRICT OF NEW JERSEY IS THE MOST APPROPRIATE TRANSFEREE FORUM.

All of the Actions should be transferred to the District of New Jersey. Among the factors that the Panel considers in determining the appropriate transferee court are: (1) the accessibility of the proposed transferee district to parties and witnesses; (2) a large number of actions are pending in the transferee district; and (3) the relevant experience of the transferee court. *See* In re Upjohn Co. Antibiotic "Cieocin" Prods. Liab. Litig., 450 F. Supp. 1168, 1171 (J.P.M.L. 1978) (transferring actions to district nearest to location of witnesses and documents that would inevitably be involved in pretrial proceedings). Consideration of all of these factors weighs in favor of transfer to the District of New Jersey.

### A.  The District of New Jersey is the Most Convenient and Accessible Transferee Jurisdiction.

The Panel weighs a forum's convenience and accessibility in selecting a transferee district. *See*, *e.g.*, In re Acacia Media Tech. Corp. Patent Litig., 360 F. Supp. 2d 1377, 1380 (J.P.M.L. 2005) (transferring cases to a "convenient and accessible district that is well equipped with the resources that this complex docket is likely to require."). The District of New Jersey is the most

convenient venue and accessible transferee district for the Actions.

One of the named Defendants, Bayer has its   principal place of business located in Whippany, N.J and is authorized to do business in the State of New Jersey and has systematic and continuous contacts with New Jersey, promotes its products in New Jersey, and has agents and representatives that are located in New Jersey.

In addition, many of the key Bayer witnesses will be from New Jersey as many of its policies and procedures likely emanate from its principal place of business in Whippany.  In addition, it is highly likely that New Jersey will be the source of documents related to Bayer's sale of its Animal and Health Division to Elanco.

Finally, New Jersey is a transportation hub with a major international airport less than twenty minutes from the Courthouse in Newark, and numerous direct flights from Florida, California and the Midwest,  as well as being a rail hub.

### B.  Three Cases Have Already Been Filed in the District of New Jersey

At least three cases have been filed in the District of New Jersey.  No other District has more than two case. Moreover, an additional two cases have already been filed in the Southern District of New York, just across the river from the Newark vicinage, which is convenient to Bayer.

The number of cases in New Jersey (and close to New Jersey)  militates in favor of transfer to the District of New Jersey. *See* D. Herr, Multidistrict Litigation Manual ("Multidistrict Litig. Manual") § 6:3 (Panel often transfers to a "state where a large number of related cases are pending"); *see also* In re: Puerto Rican Cabotage Antitrust Litig., 571 F. Supp. 2d 1378 (J.P.M.L. 2008) (transferring to district where eleven out of twenty-three actions were pending in the transferee court and ten of the eleven actions in the transferee court were before the same Judge); In re Air Crash Disaster Near Chicago, Ill., on May 25, 1979, 476 F. Supp. 445, 447 (J.P.M.L.

8

1979) (transferring to district where twelve out of sixteen actions were already pending).

###   C.  The District of New Jersey Has Favorable Docket Conditions and the Experience to Manage this Litigation.

The District of New Jersey has favorable docket conditions and the resources and experience to manage this litigation. *See, e.g.,* In re Ins. Brokerage Antitrust Litig., 360 F. Supp. 2d 1371, 1373 (J.P.M.L. 2005) (finding that the District of New Jersey was "equipped with the resources" that the complex docket would require); In re: Tropicana Orange Juice Mktg. & Sales Practices Litig., 867 F. Supp. 2d 1341, 1342 (J.P.M.L. 2012) (finding that the District of New Jersey had the resources for the MDL action).

A particularly relevant benchmark for assessing docket conditions is the percentage of cases that are over three years old. *See* Multidistrict Liti. Manual § 6:17 ("The percentage of cases over three years old is an especially useful basis for comparing the various court dockets."). As of September 20, 2020, the latest date that statistics are available, just 6.1% of civil cases in the District of New Jersey are more than three years old, which is well below the 9.6% national average.[1]

The Panel regularly considers the experience of the transferee forum in managing complex litigation. *See* In re Janus Mutual Funds Investment Litig., 310 F. Supp. 2d 1359, 1361 (J.P.M.L. 2002) (selecting a "transferee district with the capacity and experience to steer this litigation on a prudent course."). Here, the Panel should consider the expertise of the District of New Jersey in managing MDL actions. According to the Panel's statistics through April 15, 2021,  the District

---

[1] *See* Table N/A—U.S. District Courts–Combined Civil and Criminal Federal Court Management Statistics  https://www.uscourts.gov/sites/default/files/data_tables/fcms_na_distprofile0930.2020. (Sept. 30 2020)

9

of New Jersey currently has 12 active MDLs[2]  and since September 30, 202 has overseen 70

multidistrict litigations.[3] Many other district courts have far less experience with multidistrict

litigation.

## CONCLUSION

For all of the foregoing reasons, Plaintiffs respectfully request on Order granting Transfer

and Coordination in the District of New Jersey pursuant to 28 U.S.C. § 1407.

Respectfully Submitted,

**DATED:** April 27, 2021                       **NAGEL RICE, LLP**

By:        ____/s/ Bruce H. Nagel_____
           Bruce H. Nagel
           Randee M. Matloff
           103 Eisenhower Parkway
           Roseland, NJ 07068
           Tel: (973) 618-0400
           Fax: (973) 618-9194
           bnagel@nagelrice.com
           rmatloff@nagelrice.com

**POULOS LOPICCOLO PC**

/s/*Joseph LoPiccolo*_____
  Joseph LoPiccolo
  John N. Poulos
  Anthony Almeida
1305 South Roller Road
Ocean, New Jersey 07712
732-757-0165
lopiccolo@pllawfirm.com

---

[2] https://www.jpml.uscourts.gov/sites/jpml/files/Pending_MDL_Dockets_By_District-April-15-2021.pdf

[3] *See* https://www.jpml.uscourts.gov/sites/jpml/files/Cumulative%20Terminated%202020_0.pdf

10

poulos@pllawfirm.com
almeida@pllawfirm.com
*Attorneys for Plaintiff*
*Laura Revolinsky*